IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

JOHN DOE, and all others similarly
situated,

             Plaintiffs,

vs.

GREGORY SCOTT STEPHEN,
BARNSTORMERS BASKETBALL,
INC. d/b/a BARNSTORMERS
BASKETBALL OF IOWA, AMATEUR
ATHLETIC UNION OF THE UNITED
STATES, INC., and ADIDAS AMERICA,
INC.,

             Defendants.

No. 3:20-cv-0005-JAJ-CFB

**OPINION AND ORDER
REGARDING DEFENDANT
ADIDAS'S MOTIONS TO COMPEL
ARBITRATION AND TO STAY
ACTION AGAINST ADIDAS**

_____

This action arises from the sexual exploitation and abuse of minor athletes by a youth basketball coach. As pertinent, here, a minor athlete alleges that a worldwide sportswear company that sponsored his youth basketball team failed to take reasonable steps to protect the minor athletes from sexual exploitation and abuse. This action is now before the court on the sportswear company's January 16, 2020, Motion To Compel Arbitration And Stay Action Against [It] [Dkt. No. 6] and the sportswear company's January 16, 2020, Motion To Stay Deadlines Applicable To [It] Pending Resolution Of [Its] Motion To Compel Arbitration [Dkt. No. 7]. On February 10, 2020, the sportswear company filed a Motion To Supplement [Dkt. No. 13] to add to the record a complete copy of the Sponsorship Agreement on which it relies. Leave to file the Supplement was granted by text order [Dkt. No. 14] the same day. The minor athlete filed his Resistance [Dkt. No. 16] to the Motion To Compel Arbitration on February 11, 2020, and the sportswear company filed its Reply [Dkt. No. 20] on February 18, 2020. For the reasons stated below,

the sportswear company's January 16, 2020, Motion To Compel Arbitration And Stay Action Against [It] [Dkt. No. 6] and its January 16, 2020, Motion To Stay Deadlines Applicable To [It] Pending Resolution Of [Its] Motion To Compel Arbitration [Dkt. No. 7] are both **GRANTED**.

## I.    *INTRODUCTION*
### A.    *Factual Background*

The factual background set out, here, is drawn primarily from plaintiff John Doe's[1] Third Amended Class Action Petition At Law & Jury Demand filed on December 19, 2019, in the Iowa District Court for Johnson County and subsequently removed to this court by defendant adidas America, Inc.[2] *See* Removal Documents, Third Amended Petition [Dkt. No. 1-4, p. 111*ff*]. This statement of facts focuses on allegations concerning adidas most pertinent to the issues raised in adidas's Motion To Compel Arbitration and such other allegations as the court finds necessary for context.

### 1.    *Allegations about sexual exploitation*

Defendant Gregory Scott Stephen is a co-founder of Barnstormers Basketball, Inc., (BBI) and served as a coach and co-director for BBI from its inception. *Id*. at ¶ 5. BBI is a youth basketball organization in the state of Iowa that fields more than a dozen Amateur Athletic Union (AAU) boys' basketball teams for 4th through 12th grade student athletes and girls' basketball teams for 7th through 11th grade student athletes. *Id*. at 29, 33. Doe alleges that Stephen used his position of authority in BBI to secretly record nude videos of BBI's minor athletes. *Id*. at ¶ 6.

---

[1] The plaintiff is prosecuting this action under a pseudonym. He attained his majority in February 2017, a year and a half before his original Petition in this action was filed on November 2, 2018.

[2] Defendant adidas America, Inc., as indicated that its name is not capitalized. The court will follow that preference except where quoting sources that did not do so.

Stephen was indicted on April 5, 2018, in the Northern District of Iowa on charges of violating 18 U.S.C. §§ 2252(a)(1) and 2252(b)(1) for acts related to the "transportation" of child pornography.[3]  *Id.* at ¶ 7.  A superseding indictment filed June 27, 2018, charged Stephen with five counts of sexual exploitation of a minor involving production of child pornography, in violation of 18 U.S.C. § 2251(a) and (c), one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B), and one count of transporting child pornography in violation of 18 U.S.C. §§ 2252(a)(1) and (b)(2).  *Id.* at ¶¶ 8-9.  On October 9, 2018, Stephen changed his plea to guilty.  *Id.* at ¶ 10.  Pursuant to a plea agreement, filed October 18, 2018, Stephen admitted that he used a hidden camera device to secretly record several nude minor boys in hotel rooms.  *Id.* at ¶ 11.

### 2.    *Allegations relating to adidas*

Doe alleges,

> Adidas is one of the world's largest sportswear companies and a significant portion of its revenue is generated through the sale of its basketball shoes.  Adidas sponsors elite AAU teams in order to capture the best youth basketball players in hopes they will eventually become superstars and promote their shoes in the NBA and worldwide.

Third Amended Petition at ¶ 25.  Doe alleges that adidas knew of the risks to minor athletes of sexual exploitation by adults in authority and the steps necessary to protect the safety and welfare of minor athletes, yet adidas failed to protect minor athletes from Stephen's conduct.  Doe alleges that, had adidas discharged its duties, Stephen would not have victimized vulnerable minor athletes.  *Id.* at ¶ 12.

Doe alleges generally that

> 18.    Defendant Adidas owed a duty to protect the safety and ensure the privacy of BBI's athletes, all of whom

---

[3] "Transportation" of child pornography includes transmission or transfer of photographs by means of the internet or by computer, as well as physically transporting them. *See United States v. Runyan*, 290 F.3d 223, 239 (5th Cir.), *cert. denied*, 537 U.S. 888 (2002); *United States v. Whiting*, 165 F.3d 631, 634 (8th Cir. 1999).

are minors and the direct beneficiaries of Adidas' sponsorship of BBI.

19.    Defendant Adidas was negligent in its failure to perform due diligence of BBI's policies, procedures and protocols protecting BBI's minor athletes.

20.    Defendant Adidas was negligent in failing to require policies, procedures or protocols to protect BBI's minor athletes from the exploitation by Defendant Stephen— exploitation which inevitably arises from the power dynamic created by Adidas['s] sponsorship of youth sports.

Third Amended Petition, ¶¶ 18-20.

More specifically, Doe alleges that adidas began sponsoring BBI in 2016 and that it negotiated its sponsorship through Stephen.  *Id*. at ¶¶ 74-75.  As to the nature of the sponsorship, Doe alleges the following:

81.    As an Adidas-sponsored team, BBI is outfitted with free shoes, sportwear, and Adidas gear, and Adidas pays BBI's costs to travel to tournaments held across the country.

82.    Adidas exercises control over the sportswear its sponsored teams wear at its tournaments.  For example, Adidas demands its sponsored AAU teams never wear "off brands" while at sponsored tournaments.  This means players that own Nike or Under Armour backpacks, socks, or other sportswear are not allowed to bring them to Adidas tournaments.

83.    Adidas is aware that BBI's team members consists [sic] entirely of minor children.

84.    Adidas is aware that BBI's minor athletes were the direct beneficiaries of their sponsorship dollars.

Third Amended Petition at ¶¶ 81-84; *see also id*. at ¶ 37 (alleging that adidas requires its sponsored clubs, such as BBI, to mandate that their players wear only adidas shoes, shorts, jerseys, and other gear).

Doe alleges that adidas was aware of both the control exercised by the coaches of sponsored teams and the risks of sexual exploitation of minor athletes by adults in such positions of power.  *Id*. at ¶¶ 87, 90.  He also alleges that BBI, through its director and

4

coach, Stephen, stood in a position of power and influence over an AAU team's minor athletes. *Id*. at ¶ 93. Thus, Doe alleges,

> 94.   At the time Defendant Adidas entered into a sponsorship relationship with BBI, it owed Plaintiff Doe and the Class Members a duty to exercise reasonable care to protect them against individuals, such as Defendant Gregory Scott Stephen, from cruelly utilizing this position of authority for their own benefit.

Third Amended Petition at ¶ 94; *see also id.* at ¶ 235 (reiterating a nearly identical allegation in the "negligence" claim against adidas). Doe alleges that adidas failed to exercise reasonable care to protect minor athletes from exploitation of the kind Stephen perpetrated. *Id*. at ¶¶ 95-96.

### 3.   *Terms of the Sponsorship Agreement*

adidas contends that the terms of the Endorsement, Sponsorship and Supplier Agreement—AAU (Sponsorship Agreement), *see* Supplement [Dkt. No. 15], 1-3, are also relevant to the present dispute. Doe claims to have had only general knowledge that adidas was sponsoring BBI, but that he possessed no knowledge of the Sponsorship Agreement's terms or conditions and did not know of the arbitration clause in the Sponsorship Agreement prior to adidas filing its Motion To Compel Arbitration.

The Sponsorship Agreement begins,

> **THIS ENDORSEMENT, SPONSORSHIP AND SUPPLIER AGREEMENT,** the adidas Standard Terms and Conditions and all Schedules hereto (collectively, the "Agreement") is made and entered into as of **January 1, 2017** (the "Effective Date") by and between adidas America, Inc., an Oregon corporation ("adidas") and **Iowa Barnstormers**, its coaches, staff *and players* and any current, new or additional basketball teams organized and/or sponsored by such team and their respective coaches, staff *and players*, by and through its Director Jamie Johnson ("Consultant") (collectively, "Team").

Sponsorship Agreement, unnumbered 1st para. (bold emphasis in the original; italics emphasis added).  The Sponsorship Agreement was to remain in full force and effect until December 31, 2018.  *Id.* at § I.

The sponsorship consisted, in part, of a "Team Merchandise Allotment," as follows:

> **II.    Team Merchandise Allotment.** Each Contract Year and at no cost to Team, adidas shall provide [redacted] dollars ($[redacted]) worth of adidas Products (at retail value) for use by Team. adidas shall have sole discretion with respect to the styles and designs of adidas Products provided to Team. The delivery of the adidas Products required by this Section shall occur in accordance with adidas' customary seasonal product delivery cycles. During the Term, Team shall have the right to purchase other adidas basketball Products, at wholesale prices. All sales shall be subject to adidas' standard terms and conditions of sale and all adidas Products provided or purchased hereunder shall not be for resale.

Sponsorship Agreement at § II.  The Sponsorship Agreement also provided a travel funding allotment for the Team.  *Id*. at § VI.  In return, in part, "Team agrees to exclusively wear, use and promote adidas Products."  *Id*. at § III; *see also id.* at § V. (requiring "Team" to provide adidas with the sponsorship rights and benefits contained on Schedule 1).

The adidas Standard Terms & Conditions (Standard Terms), *see* Supplement [Dkt. No. 15], at 4-12, appended to and made part of the Sponsorship Agreement, include additional terms of interest, here.  Standard Term 13, concerning dispute resolution and injunctive relief, provides, as follows:

> Excluding equitable relief as provided below, *the parties agree that any dispute arising out of or related to this Agreement* shall be submitted to a mutually agreed upon mediator for non-binding confidential mediation in Portland, Oregon. *If the dispute cannot be resolved through mediation, it shall be submitted to final, binding and confidential arbitration before the Arbitration Service of Portland in Portland, Oregon.* Team further acknowledges that the Team Endorsement and the services provided hereunder are special and unique, that the breach of this Agreement will cause irreparable harm to adidas

> and that adidas shall be entitled to injunctive relief to prevent
> Team from breaching or continuing to breach this Agreement.
> *The parties agree that the procedures outlined in this Section*
> *are the exclusive methods of dispute resolution.*

Standard Terms, § 13 (emphasis added). Standard Term 14, concerning governing law, provides as follows:

> This Agreement shall be governed by and construed in accordance with the laws of the State of Oregon. The parties hereby agree and consent to the exclusive jurisdiction and venue of any state or federal court located in Multnomah County, Oregon.

Standard Terms at § 14. Standard Term 15, concerning assignment and third parties, provides, in part, "Except as expressly provided herein, nothing contained herein shall grant any third party, any rights or remedies under this Agreement." *Id.* at § 15.

### B.   Procedural Background

As mentioned, above, this action was originally filed in the Iowa District Court for Johnson County. The original Petition At Law & Jury Demand, filed November 2, 2018, did not name adidas as a party. Here, the relevant procedural history begins with Doe's December 5, 2019, motion for leave to file a Third Amended Class Action Petition At Law & Jury Demand adding a claim against adidas. The Iowa District Court granted Doe's motion for leave to amend, and the Third Amended Class Action Petition was filed on December 19, 2019.

In Count VI of the Third Amended Complaint, a "negligence" claim against adidas, Doe alleges that adidas breached the duty to exercise reasonable care in the following ways:

> 236.   Defendant Adidas failed to exercise reasonable care and breached its duty to Plaintiff Doe and the Class Members by failing to interview, investigate, or otherwise engage in any due diligence to determine whether BBI employed any protocols or procedures that would ensure the minor athletes it was sponsoring were being adequately chaperoned and protected from breaches of their safety and

7

> privacy of exactly the type perpetuated by Defendant Gregory
> Scott Stephen.

Third Amended Petition at ¶ 236.   Consequently, Doe alleges that adidas is liable for damages to Doe and one subset of putative class members. *Id*. at ¶ 237.

On January 9, 2020, adidas removed this action to this federal court pursuant to 28 U.S.C. § 1441 and the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1332(d). The motions by adidas now before the court followed on January 16, 2020.   Although adidas requested oral arguments on its motions, the court finds that the issues raised have been adequately briefed, so that the court deems the motions fully submitted on the written filings.

## II.    LEGAL ANALYSIS

adidas argues that Doe is bound by the Sponsorship Agreement, and the arbitration clause in it, for several reasons, and that Doe's negligence claim against adidas falls within the scope of the arbitration clause.   Thus, adidas argues that Doe must be compelled to arbitrate the claim against it.   Doe counters that he is not bound by the terms of the Sponsorship Agreement, including the arbitration clause, because he is not a party to the Sponsorship Agreement—indeed, he had never seen it until recently.   The court will consider the parties' specific arguments, in turn, but first, the court will summarize the standards for compelling arbitration.

### A.    Standards For Compelling Arbitration

"When reviewing an arbitration clause, [courts] ask only [1] whether a valid arbitration agreement exists and, if so, [2] whether the particular dispute falls within the terms of that agreement." *Dickson v. Gospel for ASIA, Inc.*, 902 F.3d 831, 834 (8th Cir. 2018), *reh'g denied* (Oct. 30, 2018).   As the Eighth Circuit Court of Appeals recently explained,

> The principles we apply in deciding whether to compel arbitration are well established:
>
>> (1) arbitration is a matter of contract and may not be ordered unless the parties agreed to submit the dispute to arbitration; (2) unless the parties provide otherwise, courts decide the issue of whether the parties agreed to arbitrate; (3) courts cannot weigh the merits of the grievance in determining whether the claim is subject to arbitration; and (4) when an arbitration clause exists in a contract, there is a presumption of arbitrability unless it is clear that the arbitration clause is not susceptible of an interpretation that covers the dispute.
>
> *Teamsters Local Union No. 688 v. Indus. Wire Prods., Inc.*, 186 F.3d 878, 881 (8th Cir. 1999), citing *AT & T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648-50, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., AFL-CIO v. Trane U.S. Inc.*, 946 F.3d 1031, 1033 (8th Cir. 2020), *reh'g denied* (Feb. 4, 2020). The first two principles apply to the first requirement to compel arbitration, whether there is a valid arbitration agreement; the last two apply to the second requirement, whether the particular dispute falls within the terms of the agreement.

### B.    Application Of The Standards

The court will consider, in turn, the two inquiries set out in *Dickson* to determine whether to compel arbitration. In doing so, the court will keep in mind the principles set out in *Trane*.

### 1.    Was There An Agreement To Arbitrate?

As to whether there was a valid arbitration agreement, *see Dickson*, 902 F.3d at 834 (first requirement to compel arbitration), the parties dispute whether they agreed to submit Doe's claim against adidas to arbitration, *see Trane U.S. Inc.*, 946 F.3d at 1033 (first principle). On the other hand, no party has asserted that there is any agreement that the

arbitrator, rather than the court, decides the issue of whether the parties agreed to arbitrate. *Id.* (second principle). Therefore, the court will decide this first question.

### a.        Controlling law

Notwithstanding that arbitration agreements are favored by federal law,

> [a]rbitration is a matter of contract law, and . . . parties cannot be compelled to arbitrate unless they have contractually agreed to be bound by arbitration." *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002). The primary inquiry, therefore, is to determine whether the parties formed a valid contract that binds them to arbitrate their dispute.

*Shockley v. PrimeLending*, 929 F.3d 1012, 1017 (8th Cir. 2019). "State contract law governs whether an arbitration agreement is valid." *Dickson*, 902 F.3d at 834.

Here, the parties agree that, applying Iowa choice of law rules, it makes no difference whether the court applies the law of Oregon, the law chosen in the Sponsorship Agreement, *see* Standard Terms at § 14, or Iowa law, the law of the forum state, because there is no true conflict between Oregon and Iowa law on the issues presented. *See Bacon v. Liberty Mut. Ins. Co.*, 688 F.3d 362, 366 (8th Cir. 2012) (if "no true conflict" has been identified between forum law and the law of another possible jurisdiction on the issues raised by the parties, "no choice-of-law analysis is required" (citing *Modern Equip. Co. v. Cont'l W. Ins. Co.*, 355 F.3d 1125, 1128 n.7 (8th Cir. 2004)). Thus, like the parties, the court will look to the law of both Oregon and Iowa.

### b.        Is Doe bound by the Sponsorship Agreement?

There is no dispute that the Sponsorship Agreement exists and that it contains an arbitration clause. There is also no dispute that Doe did not sign the Sponsorship Agreement—Jamie Johnson did, in his capacity as a Director of BBI. Nevertheless, the Sponsorship Agreement plainly indicates that it was the intent of the parties that Jamie Johnson was entering into the contract on behalf of the minor athletes on BBI teams, among other entities. *See* Sponsorship Agreement, unnumbered 1st para. (stating that the

Sponsorship Agreement was "between adidas America, Inc., an Oregon corporation ("adidas") and **Iowa Barnstormers**, its coaches, staff *and players*" (bold emphasis in the original; italics emphasis added)).  The question is, is Doe bound by the Sponsorship Agreement ostensibly signed on his behalf?  The parties offer several arguments on that question.

### i.      *Incapacity*

Doe argues that he *is not* bound by the arbitration clause, because he lacked the capacity, as a minor at the time, to enter into the Sponsorship Agreement.  He also argues that, even if the Sponsorship Agreement was signed by someone else on his behalf, he has since disaffirmed it, within a reasonable time of attaining his majority, by adding adidas as a defendant in the Third Amended Petition.  He also argues that the court should not find that he is bound by a contract entered into by Jamie Johnson for the same policy reasons that courts will protect minors from improvident contracts entered into by their parents.  In response, adidas argues that Doe's purported disaffirmance, almost three years after he turned 18, was not within a reasonable time of when he attained majority.  Moreover, adidas argues that Doe cannot claim that he disaffirmed the Sponsorship Agreement while, at the same time, relying on the relationship created by the Sponsorship Agreement to support— indeed, as the basis for—his claim against adidas.

Beginning with Iowa law, pursuant to an Iowa statute,

> A minor is bound not only by contracts for necessaries, but also by the minor's other contracts, unless the minor disaffirms them within a reasonable time after attaining majority, and restores to the other party all money or property received by the minor by virtue of the contract, and remaining within the minor's control at any time after attaining majority except as otherwise provided.

11

IOWA CODE § 599.2.[4]  Thus, pursuant to § 599.2, "minors are bound by all contracts, unless the minor disaffirms the contract as provided by law."  *State v. Spencer*, 737 N.W.2d 124, 129 (Iowa 2007); *see also Sweeney v. City of Bettendorf*, 762 N.W.2d 873, 880 n.3 (Iowa 2009) (§ 599.2 makes contracts by minors generally enforceable, but "allows a minor to disaffirm contracts with certain exceptions."). Disaffirmance, pursuant to § 599.2, if asserted, "goes to the whole contract"; thus, a minor is not allowed to retain some benefits of the contract, while avoiding other provisions.  *Langstraat v. Midwest Mut. Ins. Co.*, 217 N.W.2d 570, 571 (Iowa 1974).  Neither party has argued that Oregon law is different.

As to one prerequisite to disaffirmance, Doe asserts that there was no money or property that he received by virtue of the Sponsorship Agreement remaining in his control at any time after he attained majority that he was required to return, and adidas does not assert otherwise.  IOWA CODE § 599.2 (a minor disaffirming a contract must restore to the other party all money or property received by the minor by virtue of the contract and remaining within the minor's control).  On the other hand, the court questions whether the prerequisite concerning timeliness of any disaffirmance has been met, here.  That prerequisite is that disaffirmance must occur "within a reasonable time after attaining majority."  *Id*.  The court notes that nearly three years passed after Doe attained majority in February 2017 before he filed his Third Amended Complaint on December 19, 2019, purportedly disaffirming the Sponsorship Agreement.  The court has considerable doubt that waiting almost three years would be disaffirmance "within a reasonable time after attaining majority."  *Id.*  Although the parties cited no authority on the point, it is difficult to imagine that the law requires a minor to disaffirm a contract that he or she did not know existed.  Nevertheless, the court concludes that whether or not Doe attempted to disaffirm the Sponsorship Agreement within a reasonable time after attaining majority is not dispositive, here.

---

[4] None of the exceptions "otherwise provided," that is, in IOWA CODE §§ 599.3-599.6, is applicable, here.

Rather, what the court concludes is dispositive, here, is that Doe has not effectively disaffirmed the Sponsorship Agreement.  The parties have not attempted to define "disaffirm" within the meaning of § 522.9 or within the meaning of contracts involving minors more generally, nor does it appear that Iowa courts (or Oregon courts) have done so.  The court notes, however, that more than eighty years ago, the Iowa Supreme Court recognized that commencement of an action would be a sufficiently definite disaffirmance of a contract, where the action was for the consideration paid under the contract.  *See Henriott v. Main*, 225 Iowa 20, 279 N.W. 110, 115 (1938).  Turning to dictionaries for additional guidance on the ordinary meaning of the term, the court finds that the online edition of the Oxford English Dictionary defines the meaning of "disaffirm" in the specific context of "law" as follows:  "To declare (something) to be void or invalid; to cancel; to annul or reverse (a decision); to repudiate (an agreement)."  Oxford English Dictionary (online    ed.),    https://oed.com/view/Entry/53441?redirectedFrom=    disaffirm#eid. Similarly, *Black's Law Dictionary* defines "disaffirm" as "[t]o repudiate; to revoke a consent; to disclaim the intent to be bound by an earlier transaction" and "[t]o declare a (voidable contract) to be void." *Black's Law Dictionary* (9th ed.), 529.  The circumstances in which commencement of an action constituted disaffirmance of a contract in *Henriott* fit within these dictionary definitions of "disaffirm," because they plainly involved a demonstration of an intent to repudiate or reverse an agreement, to revoke consent, and not to be bound by an earlier transaction—in other words, to "undo" the agreement.

Doe's conduct is different.  Instead of asserting a claim that would "undo" the contract, Doe's negligence claim expressly relies on the existence of the relationship created by the Sponsorship Agreement.  Doe repeatedly alleges in the Third Amended Petition that, because of the Sponsorship Agreement, adidas had a duty to protect minor athletes in the BBI program it sponsored.  *See, e.g*., Third Amended Petition at ¶¶ 18 ("Defendant Adidas owed a duty to protect the safety and ensure the privacy of BBI's athletes, all of whom are minors and the direct beneficiaries of Adidas' sponsorship of

13

BBI."); 94 ("At the time Defendant Adidas entered into a sponsorship relationship with BBI, it owed Plaintiff Doe and the Class Members a duty to exercise reasonable care to protect them against individuals, such as Defendant Gregory Scott Stephen, from cruelly utilizing this position of authority for their own benefit."); 235 (reiterating the allegations of ¶ 94). Doe asserts that his negligence claim does not arise out of the terms of the Sponsorship Agreement and requires no reference to the Sponsorship Agreement to prove it, because his claim relates to adidas's duty to him to avoid the foreseeable risks of harm he alleges. Doe does not explain, however, how his claim can be proved without reference to the Sponsorship agreement or how the duty on which he relies arises in the absence of the Sponsorship Agreement. To the contrary, as adidas contends, the only way to determine what "minor athletes [adidas] was sponsoring," as alleged in ¶¶ 18 and 236 of the Third Amended Complaint, is by reference to the Sponsorship Agreement. Also, in the absence of the Sponsorship Agreement creating the sponsorship relationship, Doe alleges no plausible basis—indeed, no other basis at all—for adidas's alleged duty to avoid the risks alleged.

The court also is not persuaded by Doe's policy argument that the court should protect him from a contract improvidently entered into by Jamie Johnson on behalf of minor "players" for the same reasons courts protect minors from contracts improvidently entered into by their parents. Doe relies on *Galloway v. State*, in which the Iowa Supreme Court held that the law prevents parents or guardians from prospectively waiving a child's personal injury claims. 790 N.W.2d 252, 259 (Iowa 2010). In *Galloway*, the court relied on cases holding that the law will not permit a parent to compromise a child's financial security by waiving child support payments from the other parent in exchange for relinquishment of visitation rights, because doing so "makes the child's best interest subservient to parental self interest." *Id.* at 256 (internal quotation marks and citation omitted). Likewise, the court cited limitations on a parent's ability to receive money or other property for a minor child, absent a conservator for the minor child, or to release or

compromise a minor child's cause of action in the absence of authorization from a court. *Id*. at 256-67.  This court does not believe that a sponsorship agreement for a youth amateur basketball program entered into on behalf of minor children is similar to the examples cited in *Galloway* in the scale of the implications for a child's best interests.  Thus, the Sponsorship Agreement at issue, here, simply does not implicate the same policy concerns warranting intervention by the courts.

Furthermore, the court is not persuaded by the one case Doe cites in which a court concluded that a parent does not have authority to bind a minor child to an arbitration provision.   In *Troshak v. Terminix International Co.*, the contract at issue required the minor to waive his or her right to have potential claims for personal injury filed in a court of law, but the court found the contract invalid for the same reasons that a parent cannot prospectively release a minor child's potential personal injury claim.  No. CIV.A.98–1727, 1998 WL 401693, at \*5 (E.D. Pa. July 2, 1998) (unpublished decision).  Not only is *Troshak* simply not binding on this court, that decision appears to this court to reflect the outmoded hostility of federal courts to arbitration of claims, rather than judicial determination of claims, which the Federal Arbitration Act was intended to eliminate. *Cicle v. Chase Bank USA*, 583 F.3d 549, 553–54 (8th Cir. 2009) ("Under the Federal Arbitration Act, a written arbitration agreement such as the one at issue here 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2. Section 2 reflects congressional intent 'to overcome judicial hostility to arbitration agreements.' *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 272, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).").  Thus, the court concludes that the fact that the Sponsorship Agreement entered into on behalf of minor athletes included an arbitration clause simply is not a good policy ground for intervention by the courts.

15

Therefore, the court concludes that the Sponsorship Agreement is not invalid even though Doe was a minor at the time the Sponsorship Agreement was entered into on his behalf.

### ii.     *Third-party beneficiary*

The first ground on which adidas argues that Doe *is* bound by the Sponsorship Agreement and its arbitration provision, even though Doe is a non-signatory, is that he is a third-party beneficiary of the Sponsorship Agreement.  adidas argues that the Sponsorship Agreement clearly reflects an intention of the signatories to benefit minor athletes who were team members, as third parties.  Furthermore, adidas argues that Doe's claim against it depends on his allegations that he was a third-party beneficiary of the Sponsorship Agreement.  Doe counters that he is not a third-party beneficiary of the Sponsorship Agreement, because the contract expressly negates the creation of third-party beneficiaries; the Sponsorship Agreement did not provide him with a pecuniary benefit, where no money was provided to him; and courts do not "routinely" hold that recipients of sponsorship benefits are third-party beneficiaries, as adidas contends.

Iowa has adopted the *Restatement (Second) of Contracts* § 302 relating to third-party beneficiaries. *RPC Liquidation v. Iowa Dep't of Transp.*, 717 N.W.2d 317, 319 (Iowa 2006) (citing *Midwest Dredging Co. v. McAninch Corp.*, 424 N.W.2d 216, 224 (Iowa 1988)).  Under that scheme, "[t]he primary question in a third-party beneficiary case is 'whether the contract manifests an intent to benefit a third party.'" *RPC Liquidation*, 717 N.W.2d at 319-20 (quoting *Midwest Dredging*, 424 N.W.2d at 224).  Such intent is determined by "look[ing] to the language of the contract and to the circumstances surrounding it." *Id*. at 320.  "[T]he rights of a third-party beneficiary are controlled by the terms of the contract," which means that the third-party beneficiary is subject to the terms and conditions of the contract. *Osmic v. Nationwide Agribusiness Ins. Co.*, 841 N.W.2d 853, 860 (Iowa 2014).  Thus, the Iowa Court of Appeals has expressly held, "As a third-party beneficiary of [a] contract, [a person] can be compelled to arbitrate its claim." *DB*

*Acoustics, Inc. v. Great River Contractors, L.L.C.*, 784 N.W.2d 201, 2010 WL 1375319, *3 (Iowa Ct. App. 2010) (Table op.).

It appears that the law of Oregon, while not expressly based on the *Restatement (Second) of Contracts* § 302, is similar.   Under Oregon law, "'[u]nder proper circumstances, an arbitration provision may be enforced against a third-party beneficiary.'" *Bates v. Andaluz Waterbirth Ctr.*, 298 Or. App. 733, 741, 447 P.3d 510, 515 (2019) (quoting *Drury v. Assisted Living Concepts, Inc.*, 245 Or. App. 217, 222, 262 P.3d 1162 (2011)).   The proper circumstances are "[w]here parties enter into a contract and intend to benefit a third party." *Drury*, 245 Or. App. at 221.   There is a wrinkle in Oregon law, however.   "[T]o hold a third-party beneficiary bound to an arbitration agreement, the third-party beneficiary must have 'manifested assent to be bound by the agreement—for example, by ratifying it or asserting a claim for relief under the agreement.'" *Bates*, 298 Or. App. at 741 (quoting *Drury*, 245 Or. App. at 224).

Here, there can be no doubt that the signatories to the Sponsorship Agreement intended to benefit third parties, specifically, the minor athletes on BBI teams, such as Doe. The Sponsorship Agreement provides that, "Each Contract Year and at no cost to Team, adidas shall provide [redacted] dollars ($[redacted]) worth of adidas Products (at retail value) for use by Team," that "[d]uring the Term, Team shall have the right to purchase other adidas basketball Products, at wholesale prices," and that adidas would pay the Team a travel allotment.   Sponsorship Agreement, §§ II and VI.   These contractual terms are reflected in Doe's own characterization of the sponsorship in the Third Amended Petition. *See* Third Amended Petition at ¶ 81 ("As an Adidas-sponsored team, BBI is outfitted with free shoes, sportwear, and Adidas gear, and Adidas pays BBI's costs to travel to tournaments held across the country.").   As the wearers of the shoes, sportswear, and gear, and the recipients of travel funding, the players were the intended beneficiaries of the Sponsorship Agreement.   The Third Amended Petition recognizes this, because it alleges that the "minor athletes" were "the direct beneficiaries of Adidas' sponsorship of BBI."

17

*Id*. at ¶ 18.  Thus, under Iowa law, because the Sponsorship Agreement clearly manifests an intent to benefit Doe and other minor athletes on BBI teams, it seems clear that Doe was a third-party beneficiary of the Sponsorship Agreement.  *See RPC Liquidation*, 717 N.W.2d at 319-20.

Nevertheless, Doe argues that he is *not* a third-party beneficiary of the Sponsorship Agreement for three reasons.  First, he argues that the contract expressly negates the creation of third-party beneficiaries.  In support of this argument, he points to Standard Term 15, concerning assignment and third parties.  Again, that provision states, in pertinent part, "Except as expressly provided herein, nothing contained herein shall grant any third party, any rights or remedies under this Agreement."  While Doe focuses on the disclaimer of any third-party rights, adidas focuses on the stated exception.  As adidas points out, this provision states, "Except as expressly provided herein." Also, the Sponsorship Agreement elsewhere expressly states the intention that "players" be bound by the Sponsorship Agreement and that they receive sportswear and travel funding pursuant to the Sponsorship Agreement, such that they are third-party beneficiaries.  Thus, Doe's reliance on the disclaimer in Standard Term 15 is not persuasive.

Second, Doe argues that the Sponsorship Agreement does not provide for, or intend, a *pecuniary* benefit to him or other minor athletes on BBI teams, because it did not provide *money* to them, as he contends it must to make him a third-party beneficiary.  In support of this contention, he cites *Vogan v. Hayes Appraisal Assocs, Inc.*, 588 N.W.2d 420 (Iowa 1999).  That decision states, in pertinent part, "'A third party who is not a promisee and who gave no consideration has an enforceable right by reason of a contract made by two others . . . *if the promised performance will be of pecuniary benefit to [the third party]* and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee. . . .'"  *Vogan*, 588 N.W.2d at 423-24 (quoting *Tredrea v. Anesthesia & Analgesia, P.C.*, 584 N.W.2d 276, 281-82 (Iowa 1998)).  Doe then relies on the *Black's Law Dictionary* definition of "pecuniary" as "[o]f or relating to money;

18

monetary <a pecuniary interest in the lawsuit>." *Black's Law Dictionary* (9th ed.), 1245; *see also id.* (11th ed) (cited by Doe, adding "or consisting of money").

The court is not persuaded by Doe's argument that these sources lead to the conclusion that the "pecuniary" benefit required to make him a third-party beneficiary must be payment of money. The *Black's Law Dictionary* definitions do not suggest that a "pecuniary" benefit *must* consist of money; they make clear that a *monetary interest* is sufficient. Moreover, the decision in *Vogan* makes clear that providing *money* is not required, because the "pecuniary benefit" found sufficient in that case was "some protection for the money [property purchasers] had invested in the project," by providing periodic inspections and progress reports on a project on the property, not money itself. 588 N.W.2d at 424. Here, the Sponsorship Agreement also provided "pecuniary" benefits to Doe, consisting of sportswear and travel funding, because those benefits had a monetary value.

Finally, whether or not courts "routinely" hold that recipients of sponsorship benefits are third-party beneficiaries is simply irrelevant, here. This is so, precisely because the Sponsorship Agreement at issue, here, was plainly intended to provide benefits to minor athletes on sponsored teams. *See RPC Liquidation*, 717 N.W.2d at 319-20.

Therefore, because Doe was a third-party beneficiary of the Sponsorship Agreement, under Iowa law, he is bound by the arbitration clause in that Sponsorship Agreement. *Osmic*, 841 N.W.2d at 860 (a third-party beneficiary is subject to the terms and conditions of a contract); *DB Acoustics, Inc.*, 784 N.W.2d 201, 2010 WL 1375319, *3 (a third-party beneficiary of a contract is bound by an arbitration clause). It is equally clear that Doe is a third-party beneficiary of the Sponsorship Agreement under Oregon law. *See Drury*, 245 Or. App. at 221 (under Oregon law, a party is a third-party beneficiary "[w]here parties enter into a contract and intend to benefit a third party"). Whether Doe is bound by the arbitration clause in the Sponsorship Agreement under Oregon law, however, involves

19

some further analysis, *see Bates*, 298 Or. App. at 741, which the court undertakes in the following subsections of this opinion.

### iii.    *Ratification*

adidas argues that Doe ratified the Sponsorship Agreement by accepting its benefits. adidas argues that knowingly accepting the benefits of a transaction ratifies the act of entering into the transaction under both Iowa and Oregon law.  adidas points out that Doe's Third Amended Petition shows that he knew the material terms of the Sponsorship Agreement concerning sportswear and travel funding and that Doe not only accepted those benefits but he continues to rely on the Sponsorship Agreement as the basis for his claims against adidas.  Doe argues that, contrary to adidas's contentions, he has not ratified the Sponsorship Agreement, because he was not Jamie Johnson's "principal," and Jamie Johnson was not his "agent"; he had no power to avoid the contract; and he did not possess full knowledge of material facts as required to ratify the contract.

As to Iowa law, the Iowa Supreme Court has explained,

> It has long been the law in Iowa "[w]hen an unauthorized agreement of an agent has been ratified by his [or her] principal, an action lies thereon, as though originally made by due authority." *Lyon Cnty. Nat'l Bank v. Carsten Winter Estate*, 214 Iowa 533, 539, 242 N.W. 600, 603 (1932); *accord* Restatement (Third) of Agency § 4.01(1), at 304. In other words, if ratification exists a contract exists and the action is on the contract.

*Life Inv'rs Ins. Co. of Am. v. Estate of Corrado*, 838 N.W.2d 640, 644 (Iowa 2013).

Although the Iowa Supreme Court observed that it had previously adopted the *Restatement (Second) of Agency* § 82, at 210 (1958), as defining ratification, *id.* at 645-46 (citing *Abodeely v. Cavras*, 221 N.W.2d 494, 502 (Iowa 1974)), in *Corrado*, the court adopted the *Restatement (Third) of Agency* § 4.01.  Section 4.01 defines ratification as "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority."  *Restatement (Third) of Agency* § 4.01(1) at 304); *see also Corrado*, 838 N.W.2d at 646 (citing § 4.01(1)).

What is most significant about the Iowa Supreme Court's decision in *Corrado*, here, is the effect it has on Doe's "agency" argument. The court explained,

> [W]hether [the third party] expressly or implicitly authorized a person to sign on his behalf is not a necessary fact to determine whether [that party] ratified the contract. A principal may ratify the unauthorized act of an agent. *See Abodeely v. Cavras*, 221 N.W.2d 494, 502 (Iowa 1974) (stating a factor to determine whether a contract is ratified often is whether a principal accepted benefits from an agent's unauthorized act). *Even if the actor who signed the contract was not [the third party's] agent at the time of signing, "[a] person may ratify the act of an actor who was not an agent at the time of acting," providing the actor purports to be the person's agent or assumed to be the person's agent*. Restatement (Third) of Agency ch. 4, intro. note, at 304 (2006).

*Corrado*, 838 N.W.2d at 644 (emphasis added). The court explained that the *Restatement (Second) of Agency* § 85(1) and the court's caselaw provided that "an actor may only ratify an act if the actor purported to act as an agent," while *Restatement (Third) of Agency* § 4.03 provides "'[a] person may ratify an act if the actor *acted* or purported to act as an agent on the person's behalf." *Corrado*, 838 N.W.2d at 647 (quoting *Restatement (Third) of Agency* § 4.03, at 321 (emphasis added by the Iowa Supreme Court)). The Iowa Supreme Court concluded, "Iowa law should abandon the 'purported to act' rule contained in the Restatement (Second) of Agency and our prior caselaw in favor of the rule contained in the Restatement (Third) of Agency, that an undisclosed principal may ratify an actor's unauthorized act." *Id.* Here, by signing the Sponsorship Agreement on behalf of "players" on BBI teams, *see* Sponsorship Agreement, unnumbered 1st para., Jamie Johnson undeniably acted as agent of the players, even if he was not, in fact, the players' agent at the time and the act was unauthorized, and/or he purported to be the agent of the players. *Corrado*, 838 N.W.2d at 644, 647. It is equally clear that both Jamie Johnson and adidas assumed Jamie Johnson to be the players' agent. *Id.* Thus, the question is not one of Jamie Johnson's "agency," but whether Doe ratified Johnson's unauthorized act.

21

Doe also argues that he had no power to avoid the Sponsorship Agreement and that he did not possess full knowledge of material facts as required to ratify it. Although the decision in *Corrado* does not directly address either contention, the *Restatement (Third) of Agency* does, by reference, in § 4.01(3), which the *Corrado* court cited. *See Corrado*, 838 N.W.2d at 846 (citing § 4.01(2) and (3) as defining, respectively, the elements of ratification and when ratification does not occur).

Doe's contention that he had no power to avoid the Sponsorship Agreement is contrary to his argument that he disaffirmed the Sponsorship Agreement upon attaining majority. Also, *Restatement (Third) of Agency* § 4.03(b) states that ratification does not occur unless "the person ratifying has capacity as stated in § 4.04." Section 4.04(2) provides that, "[a]t a later time [than the act in question], a principal may avoid a ratification made earlier when the principal lacked capacity as defined in § 3.04." Comment b to § 3.04 explains that a minor who lacks full capacity may elect to be bound by a transaction made during the period he lacked capacity. Thus, assuming Doe ratified the Sponsorship Agreement by accepting benefits pursuant to it while a minor, Doe had the capacity to avoid that earlier ratification of the Sponsorship Agreement upon reaching his majority.

At first blush, Doe appears to stand on firmer ground when he asserts that he lacked full knowledge of material facts as required to ratify the Sponsorship Agreement. *Restatement (Third) of Agency* § 4.06 provides, "A person is not bound by a ratification made without knowledge of material facts involved in the original act when the person was unaware of such lack of knowledge." This is consistent with Iowa decisions, such as *Ellwood v. Mid States Commodities, Inc.*, in which the court defined one of the elements of ratification as the "principal's full knowledge of material facts." 404 N.W.2d 174, 179 (Iowa 1987). Doe asserts that he did not know of the Sponsorship Agreement. However, as comment b to *Restatement (Third) of Agency* § 4.06 makes clear, "The principal's consent to be bound by what the agent has done depends on whether the principal knows the relevant facts, not the source of the principal's knowledge." Here, Doe's allegations in

22

the Third Amended Petition about what adidas provided pursuant to the Sponsorship Agreement—sportswear and travel funding—demonstrate that Doe knew the relevant facts, which were that adidas sponsored BBI teams by providing sportswear and travel funding, even if the source of the information was not from knowledge of the Sponsorship Agreement, itself. *Compare* Third Amended Complaint at ¶ 81, *with* Sponsorship Agreement at §§ II and VI.

Furthermore, comment c to § 4.06 explains "material facts" as follows:

> Not all facts are material for purposes of this doctrine. The point of materiality in this context is the relevance of the fact to the principal's consent to have legal relations affected by the agent's act.

*Restatement (Third) of Agency* § 4.06, cmt. c. By way of illustrations, the comments to § 4.06 explain that, where a principal learns that an agent has contracted for purchase of an item, and the terms of that purchase, and accepts delivery of the item, but does not know that the agent has also contracted to purchase a second item, the presence of the provision to purchase the second item in the contract is a material fact. *Id.* at cmt. b, illustration, and comment c, illustration. Doe does not identify any purportedly material term of the Sponsorship Agreement that he did not know, and certainly no term on a par with an obligation to purchase an additional item under a purchase contract. Although he apparently was unaware of the arbitration clause, such a clause does not affect Doe's "legal relations" with adidas, only the forum in which a legal dispute must be resolved. *See id.* at cmt. c.

As to whether Doe ratified the Sponsorship Agreement, again, ratification under Iowa law means "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Restatement (Third) of Agency* § 4.01(1) at 304); *see also Corrado*, 838 N.W.2d at 646 (citing § 4.01(1)). More specifically,

[T]he Restatement (Third) of Agency provides:

23

> (2) A person ratifies an act by
>
>> (a) manifesting assent that the act shall affect the person's legal relations, or
>>
>> (b) conduct that justifies a reasonable assumption that the person so consents.

*Restatement (Third) of Agency* § 4.01(2); *Corrado*, 838 N.W.2d at 646 (quoting § 4.01(2)). For the same reasons that the court concluded that Doe did not "disaffirm" the Sponsorship Agreement upon attaining majority, that is, by suing adidas, the court now concludes that he, in fact, ratified the Sponsorship Agreement. As the Iowa Supreme Court explained in *Corrado*, "A person should not be able to accept the benefits of a contract even if the signer's acts are unauthorized, but deny his or her obligations under the contract because the signer's acts are unauthorized." 838 N.W.2d at 647.

Specifically, Doe repeatedly alleges in the Third Amended Petition that, because of the Sponsorship Agreement, adidas had a duty to protect minor athletes in the BBI program it sponsored. *See, e.g.*, Third Amended Petition at ¶¶ 18 ("Defendant Adidas owed a duty to protect the safety and ensure the privacy of BBI's athletes, all of whom are minors and the direct beneficiaries of Adidas' sponsorship of BBI."); 94 ("At the time Defendant Adidas entered into a sponsorship relationship with BBI, it owed Plaintiff Doe and the Class Members a duty to exercise reasonable care to protect them against individuals, such as Defendant Gregory Scott Stephen, from cruelly utilizing this position of authority for their own benefit."); 235 (reiterating the allegations of ¶ 94). Such conduct both manifests assent to the Sponsorship Agreement affecting Doe's legal relations with adidas and justifies a reasonable assumption that Doe so consents. *Restatement (Third) of Agency* § 4.01(2). Doe should not be able to deny his obligation to arbitrate disputes under the Sponsorship Agreement while accepting the benefits of that contract as establishing adidas's alleged duty on which his negligence claim against adidas is based. *Cf. Corrado*, 838 N.W.2d at 647.

The court concludes that, under Iowa law, Doe ratified the Sponsorship Agreement.

Doe's contention that he did not ratify the Sponsorship Agreement does not cite or rely on Oregon law or cite any Oregon cases. As adidas points out, the Oregon Court of Appeals has stated,

> Ratification occurs when a principal either manifests assent to be bound or engages in conduct indicative of consent by the principal. *Restatement (Third) of Agency* § 4.01 (2006). "For example, knowing acceptance of the benefit of a transaction ratifies the act of entering into the transaction. This is so even though the person also manifests dissent to becoming bound by the act's legal consequences." *Id*. at § 4.01 comment d; *see also id*. at § 4.01 comment g.

*Lemley v. Lemley*, 221 Or. App. 172, 181, 188 P.3d 468, 473 (2008). Thus, the standard for ratification under Oregon law, as under Iowa law, is *Restatement (Third) of Agency* § 4.01(2). For the reasons set out, just above, Doe accepted the benefits of the Sponsorship Agreement, even if he now manifests dissent to becoming bound by the Sponsorship Agreement's legal consequences of an arbitration clause. *Id.*

Thus, the court concludes that, under Oregon law, Doe has also ratified the Sponsorship Agreement. Moreover, such ratification binds Doe to the arbitration clause in the Sponsorship Agreement to which he is a third-party beneficiary under Oregon law. *See Bates*, 298 Or. App. at 741.

### iv. Estoppel

The third ground on which adidas argues that Doe *is* bound by the arbitration clause in the Sponsorship Agreement is estoppel. Somewhat more specifically, adidas argues that Doe is estopped from arguing that the Sponsorship Agreement is not binding, because he received direct benefits from that Agreement and continues to use it as the basis for his claim against adidas. Doe argues that estoppel does not apply, because he did not knowingly exploit the terms of the Sponsorship Agreement and his negligence claim against adidas does not rely upon the Sponsorship Agreement.

The parties agree that the standards for estoppel applicable, here, are set out in *Roth v. The Evangelical Lutheran Good Samaritan Society*, 147 F. Supp. 3d 806, 811 (N.D.

25

Iowa 2015), (adidas) or identical standards set out, for example, in the cases on which *Roth* relied (Doe). As now-retired United States District Judge Mark W. Bennett explained in *Roth*, "estoppel" is one theory by which ""'"[a] willing signatory [here, adidas] seeking to arbitrate with a non-signatory that is unwilling [here, Doe]'"" may compel the non-signatory to arbitrate. 147 F. Supp. 3d at 811 (quoting *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 799 (8th Cir. 2005), in turn quoting *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131–32 (2d Cir. 2003), and citing *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)). As Judge Bennett explained,

> In *Reid [v. Doe Run Resources Corp*., 701 F.3d 840, 846 (8th Cir. 2012)]*, the court described two forms of "direct benefits estoppel": (1) where the non-signatory knowingly seeks and obtains "direct benefits" from the contract containing the arbitration clause, and (2) where the non-signatory seeks to enforce the terms of the contract containing the arbitration clause or asserts claims that must be determined by reference to the contract containing the arbitration clause. *Id*.

*Roth*, 147 F. Supp. 3d at 811.

Here, Doe's protestations notwithstanding, the record shows both kinds of "direct benefit estoppel." First, much as the court explained, above, Doe sought and obtained "direct benefits" from the Sponsorship Agreement containing the arbitration clause, when he sought membership on a BBI team sponsored by adidas and obtained the benefits of the Sponsorship Agreement by accepting sportswear and travel funding pursuant to the Sponsorship Agreement. *Id.* Knowledge that the benefits are *pursuant to* a Sponsorship Agreement is not a requirement of this form of estoppel. The authorities on "direct benefit" estoppel cited by Doe are not to the contrary. Second, Doe asserts a negligence claim against adidas that must be determined by reference to the Sponsorship Agreement containing the arbitration clause. *Id.* Again, as adidas contends, the only way to determine what "minor athletes [adidas] was sponsoring," as alleged in ¶¶ 18 and 236 of the Third Amended Complaint, is by reference to the Sponsorship Agreement. Also, in the absence of the Sponsorship Agreement creating the sponsorship relationship, Doe alleges no

plausible basis—indeed, no other basis at all—for adidas's alleged duty to avoid the risks alleged. No party asserts that the result would be different under Oregon law.

Therefore, the court concludes that Doe is also bound by the arbitration clause in the Sponsorship Agreement by estoppel.

### c.     Summary

Here, adidas has demonstrated that Doe is bound by the arbitration clause, even though he is a non-signatory to the Sponsorship Agreement in which the arbitration clause is contained, because Doe is a third-party beneficiary of the Sponsorship Agreement, he ratified the Sponsorship Agreement, and/or he is estopped to deny application of the arbitration agreement. On the other hand, Doe has failed to demonstrate that there is any impediment to application of the arbitration clause, despite the fact that he did not sign the Sponsorship Agreement. Therefore, in answer to the first question determining whether the arbitration clause is enforceable against Doe, the court concludes that, yes, a valid arbitration agreement exists. *Dickson*, 902 F.3d at 834.

### 2.     Does the dispute fall within the terms of the arbitration agreement?

The second question the court must answer to determine whether the arbitration agreement is enforceable is "whether the particular dispute falls within the terms of that agreement." *Id*. As explained, above, in a dispute resolution provision, the Sponsorship Agreement states, in pertinent part, "the parties agree[d] that any dispute arising out of or related to this Agreement" would be submitted to non-binding mediation or, if mediation failed, "to final, binding and confidential arbitration before the Arbitration Service of Portland in Portland, Oregon." Standard Terms, § 13. adidas argues that Doe's claim against it not only touches on matters covered by the arbitration provision, it is entirely dependent on the Sponsorship Agreement. Thus, adidas contends that adidas's supposed liability both arises out of and relates to the Sponsorship Agreement. Although Doe does not expressly confront the second requirement to compel arbitration, he does argue that his claim against adidas does not arise out of the terms of the Sponsorship Agreement.

27

As to the question of whether the dispute falls within the terms of the arbitration agreement, the two guiding principles cited by the Eighth Circuit Court of Appeals are that this court cannot weigh the merits of the dispute in determining whether the claim is subject to arbitration, and, because an arbitration clause exists in the contract, there is a presumption of arbitrability unless it is clear that the arbitration clause is not susceptible of an interpretation that covers the dispute. *Trane U.S. Inc.*, 946 F.3d at 1033. To put the second principle somewhat differently, "'any doubts concerning the scope of arbitratable issues should be resolved in favor of arbitration.'" *Northport Health Servs. of Arkansas, LLC v. Posey*, 930 F.3d 1027, 1030 (8th Cir. 2019) (quoting *Lyster v. Ryan's Family Steak Houses, Inc.*, 239 F.3d 943, 945 (8th Cir. 2001), with internal quotation marks omitted by the *Posey* court). Thus, the court must find that the dispute is arbitrable, "unless [the court] can say 'with positive assurance' that the arbitration clause cannot be construed to encompass the dispute." *Dickson*, 902 F.3d at 835 (quoting *Unison Co. v. Juhl Energy Dev., Inc.*, 789 F.3d 816, 818 (8th Cir. 2015)). Indeed, "When an arbitration provision is broad, the federal policy favoring arbitration requires a district court to send claims to arbitration 'as long as the underlying factual allegations simply touch matters covered by the arbitration provision.'" *Id.* (quoting *Unison*, 789 F.3d at 818).

In *Dickson*, the court observed that an arbitration clause requiring arbitration of "any and all disputes of any kind arising out of the relationship between myself and GFA" was "[w]ithout question . . . broad." *Id.* If anything, the arbitration clause, here, is even broader, embracing not only "any dispute arising out of" the Sponsorship Agreement, but "any dispute . . . related to" the Sponsorship Agreement. Thus, this is the sort of broad arbitration provision that warrants compelling arbitration "'as long as the underlying factual allegations simply touch matters covered by the arbitration provision." *Id.* At the very least, Doe's negligence claim against adidas involves underlying factual allegations that "touch" matters covered by the arbitration provision. Again, the only way to determine what "minor athletes [adidas] was sponsoring," as alleged in ¶¶ 18 and 236 of the Third

28

Amended Complaint, is by reference to the Sponsorship Agreement, and the only basis Doe has alleged for adidas's duty to avoid risks to minor athletes at BBI is the sponsorship relationship created by the Sponsorship Agreement. This court cannot say 'with positive assurance' that the arbitration clause cannot be construed to encompass the dispute." *Dickson*, 902 F.3d at 835 (quoting *Unison Co.*, 789 F.3d at 818). Therefore, the court concludes that Doe's claim against adidas "falls within the terms of that agreement." *Id*. at 834.

### C.    *Additional Matters*

Because adidas has demonstrated that both requirements to compel arbitration are satisfied in this case, adidas's Motion To Compel Arbitration must be granted. This raises the question, however, of whether only Doe's individual claim, or his claim on behalf of a putative class, as well, must be sent to arbitration. In *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407 (2019), the Supreme Court held that "[c]ourts may not infer from an ambiguous agreement that parties have consented to arbitrate on a classwide basis," so that classwide arbitration requires a "contractual basis" to conclude that the parties agreed to it. 139 S. Ct. at 1416, 1419 (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010)).  adidas asserts that the arbitration provision in the Sponsorship Agreement provides no such affirmative and unambiguous contractual basis for class arbitration, and Doe does not argue otherwise. Therefore, only Doe's individual claim against adidas must be sent to arbitration.

In its Motion To Stay Deadlines, adidas seeks a stay of all deadlines as to it pending resolution of its Motion To Compel Arbitration, while in its Motion To Compel Arbitration, adidas seeks an order compelling Doe to arbitrate his claim against adidas on an individual basis and staying his action against adidas pending the conclusion of any arbitration. Doe offered no argument on whether the claim against adidas should be stayed or dismissed pending arbitration, if the court did, in fact, compel arbitration. The district court has

discretion to stay an action or dismiss it pending resolution of arbitration.  *See McLeod v. Gen. Mills, Inc*., 856 F.3d 1160, 1168 (8th Cir. 2017) (citing *Unison*, 789 F.3d at 821); *see also* 9 U.S.C. § 3.  Here, the court deems it appropriate to stay all deadlines as to adidas and to stay the action as to adidas, where claims against others will move forward.  The court concludes, further, that the stay should include Doe's claim against adidas on behalf of a putative class, as the arbitration may be instructive on matters related to the class claim, should Doe's individual claim ultimately return to this court.

### III.    CONCLUSION

Upon the foregoing,

**IT IS ORDERED** that

1.       Defendant adidas's January 16, 2020, Motion To Compel Arbitration And Stay Action Against adidas [Dkt. No. 6] is **GRANTED**;

2.       Defendant adidas's January 16, 2020, Motion To Stay Deadlines Applicable To adidas Pending Resolution Of adidas's Motion To Compel Arbitration [Dkt. No. 7] is **GRANTED**.

**IT IS FURTHER ORDERED**

1.       that all deadlines in this action are **STAYED** *as to defendant adidas*;

2.       that plaintiff John Doe and defendant adidas are compelled to arbitrate Doe's *individual* claim against adidas; and

3.       that this action is **STAYED** *as to all further proceedings involving adidas* pending conclusion of any arbitration pursuant to 9 U.S.C. § 3.

**DATED** this 4th day of March, 2020.

_____
JOHN A. JARVEY, Chief Judge
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA